# Third District Court of Appeal

## State of Florida

Opinion filed October 3, 2018.
Not final until disposition of timely filed motion for rehearing.

————————————

Nos. 3D17-633 & 3D17-293
Lower Tribunal Nos. 14-2520B, 14-4014C,
15-6, 15-1878A & 15-2741B

————————————

**U.T., a juvenile,**
Appellant,

vs.

**The State of Florida,**
Appellee.

Appeals from the Circuit Court for Miami-Dade County, Angelica D. Zayas, Judge.

Carlos J. Martinez, Public Defender, and Billie Jan Goldstein, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Keri T. Joseph, Assistant Attorney General, for appellee.

Before LAGOA, LOGUE and SCALES, JJ.

SCALES, J.

U.T., a juvenile, appeals two contempt orders and respective sentencings, entered on January 17, 2017, in which the trial court found that U.T. committed indirect contempt of court by his repeated violations of home detention orders. Because the trial court did not violate the statutory blueprint of chapter 985 of the Florida Statutes, as it relates to a juvenile who has been committed to the care and custody of the Florida Department of Juvenile Justice ("DJJ"), we affirm.

**I. Relevant Facts and Procedural Background**

On February 3, 2016, the trial court found U.T., then age fourteen, delinquent in five cases, involving the charges of petit theft (twice), strong arm robbery, burglary and resisting an officer with violence. Pursuant to section 985.441(1)(b) of the Florida Statutes, the trial court committed U.T. to DJJ at a "minimum risk nonresidential" restrictiveness level.[1] Under the terms of the commitment, U.T. would live at home with his mother and attend a day treatment program at AMIkids Miami-Dade ("AMI").

U.T.'s behavior problems persisted after his commitment to DJJ. He stopped attending the AMI program. He was arrested again in May of 2016, on a new charge of grand theft (lower court case number J16-1474). At a pivotal hearing on June 20, 2016 – a docket sounding on U.T's new criminal charge – DJJ requested that the trial court place U.T. on home detention with an electronic monitor around

_____

[1] See § 985.03(44)(a), Fla. Stat. (2016).

his ankle. The trial court agreed to this procedure with the idea that once U.T.'s daily life became stable the electronic ankle monitor could be removed. At this hearing, the trial court asked U.T.'s counsel whether there was any reason the court should not impose home detention on U.T. U.T.'s defense counsel offered no objection. The trial court also set August 1, 2016, as the trial date on the grand theft charge. During the summer of 2016, however, U.T.'s behavior worsened.

From June 20, 2016 through August 1, 2016, U.T. routinely violated his home detention by leaving home. On July 5, 2016, U.T. cut off the electronic ankle monitor and went missing for almost a month. U.T. was back in court on August 1, 2016, and, again with no objection from U.T.'s counsel, the trial court entered a second home detention order, again with electronic monitoring.[2] At this hearing, the trial court warned U.T. that U.T. could be held in contempt of court if U.T. continued violating court orders. Because U.T.'s family living situation was unstable, the trial court urged U.T.'s mother to establish a structured living environment for U.T., either at home or in another place, and to determine whether AMI would allow U.T. to return to its day treatment program.

The trial court's admonitions proved unsuccessful. From August 1, 2016 through September 7, 2016, U.T. continued to violate the August 1, 2016 detention

---

[2] Although the trial court had set August 1, 2016, as the date of trial on U.T.'s outstanding grand theft charge, the trial did not occur on this date. The State entered a *nolle prosequi* on this charge on October 25, 2016, after the victim and a witness failed to appear.

order. Notwithstanding U.T.'s ungovernable behavior, at no time did DJJ hold an administrative transfer hearing pursuant to section 985.441(4) of the Florida Statutes. Rather, DJJ continued to file affidavits of violation for U.T.'s ongoing violations of the trial court's home detention orders; and, for the violations that occurred after August 1, 2016, these affidavits included a request that the trial court find U.T. in contempt and place U.T. in secure detention.

The trial court responded to these affidavits by entering a September 9, 2016 order directing U.T. to show cause why he should not be held in indirect criminal contempt for twelve alleged violations of the trial court's prior orders. On September 13, 2016, the trial court conducted a hearing on the contempt charges and found U.T. guilty of ten of the twelve charges. While the trial court deferred sentencing, the court, at the end of the hearing, admonished U.T. to follow the rules associated with the previously ordered home detention.

Yet, in the days after the September 13th hearing, U.T. committed additional home detention violations and, on October 7, 2016, U.T. picked up additional criminal charges of burglary, grand theft and resisting an officer without violence (lower court case number J16-2574).[3] This behavior caused the trial court, on October 11, 2016, to issue a second show cause order alleging five additional

---

[3] On November 18, 2016, in yet another incident, U.T. was charged with battery (lower court case number J16-2946). On February 22, 2017, the trial court found U.T. delinquent in both J16-2574 (for the lesser included offense of petit theft only) and J16-2946.

4

violations of prior court orders. On October 28, 2016, the trial court started, but did not conclude, both (i) the deferred sentencing hearing based on the findings of the September 13th contempt hearing, and (ii) the second indirect contempt trial based on the trial court's October 11th show cause order. These proceedings continued on January 9, 2017, and the trial court ultimately found U.T. guilty of three of the five charges alleged in the October 11th show cause order.

At the conclusion of the January 9, 2017 hearing, the trial court entered a Judgment of Guilt-Contempt, memorializing its adjudication of the September 9, 2016 show cause order (from which the trial court found U.T. guilty of ten violations). In this order, the trial court sentenced U.T. to one hundred forty days of secure detention; however, factoring concurrent sentences for two of the ten counts, the net sentence for these violations amounted to one hundred twenty-five days. U.T. timely appealed this judgment (case number 3D17-293).

In its judgment adjudicating its second show cause order (involving the October 11, 2016 show cause order where the trial court found U.T. guilty of three additional violations), the trial court sentenced U.T. to twenty days of secure detention to run concurrently with the secure detention sentence related to the September 9, 2016 show cause order. U.T. timely appealed this judgment (case number 3D17-633). We granted U.T.'s motion to consolidate his two appeals.[4]

_____

[4] While not relevant to the issues in this appeal, we note that, while U.T. was serving his sentence for contempt, he pleaded guilty in three open delinquency

5

**II. Analysis**

*A. Introduction*

On appeal, U.T. asserts that, because U.T. had been "committed" to DJJ pursuant to section 985.441(1)(b) of the Florida Statutes, U.T.'s only disciplinary remedy was for DJJ to conduct a transfer hearing pursuant to section 985.441(4). U.T. argues that the trial court lacked the statutory authority to enter the two home detention orders, and that the resulting contempt findings were therefore unlawful. U.T. further asserts that the alleged error – entering the home detention orders without the requisite statutory authority – is "jurisdictional" in nature, so as not to require any contemporary objections. Because we conclude that the subject home detention orders were authorized by the relevant provision of Chapter 985, we affirm on this basis, and therefore, do not reach U.T.'s argument that the alleged error can be raised for the first time on appeal.

*B. Commitment Provisions of Chapter 985*

At a disposition hearing on February 3, 2016, the trial court committed U.T. to the care and custody of DJJ for a "Minimum Risk Non-Residential Program." From that point forward, U.T's treatment and anticipated rehabilitation were

---

cases, and the parties agreed that U.T. would be placed on a waiting list for commitment to a high-risk residential facility. Because U.T. would not be transported to this facility until his contempt sentence was complete, U.T. requested that the trial court mitigate his sentence. The trial court denied this request, but directed DJJ to advise the court when and if a placement at a high-risk residential facility became available during U.T.'s contempt sentence.

governed by the provisions of chapter 985. Specifically, U.T.'s commitment was authorized by section 985.441(1)(b) of the Florida Statutes (2016).[5] The general terms and conditions of commitment are outlined in section 985.455(3) of the Florida Statutes (2016).

If commitment does not succeed in rehabilitating a child, DJJ may invoke an administrative "transfer" option to find another facility or program to address the child's ongoing behavior problems. § 985.441(4), Fla. Stat. (2016). The trial court may agree to the transfer or hold a hearing to review the proposed transfer. Id. In this case, DJJ did not seek to transfer U.T. to another program after U.T. failed to attend AMI on a regular basis. U.T. argues that, because DJJ sought and obtained home detention of U.T., rather than a transfer to another rehabilitative program, the

---

[5] The statute reads in relevant part:

> (1) The court that has jurisdiction of an adjudicated delinquent child may . . .
>
>    . . . .
>
> (b) Commit the child to the department at a restrictiveness level defined in s. 985.03. Such commitment must be for the purpose of exercising active control over the child, including, but not limited to, custody, care, training, monitoring for substance abuse, electronic monitoring, and treatment of the child and release of the child from residential commitment into the community in a postcommitment nonresidential conditional release program.

§ 985.441(1)(b), Fla. Stat. (2016).

trial court violated chapter 985's commitment protocol when it complied with DJJ's request. Concomitantly, U.T. argues that because the goal of chapter 985 is the rehabilitation of a committed child, rather than punishment, the trial court's contempt orders violated the spirit of chapter 985.

C. *Nonsecure detention provisions of Chapter 985*

Chapter 985 does not give explicit instruction as to whether a court may place a committed child in secure or nonsecure detention. When U.T. appeared before the trial court on June 20, 2016, for a docket sounding on his new felony charge (J16-1474), however, he was not merely a child committed to DJJ's care. U.T. was also a juvenile facing a new grand theft charge. At this June 20, 2016 hearing, the trial court placed U.T. on home detention and ordered that he wear an electronic ankle monitor. Home detention, a form of nonsecure detention, is defined in section 985.03(18). "Detention care" means "the temporary care of a child in secure or nonsecure detention, pending a court adjudication or disposition. . . ." § 985.03(18), Fla. Stat. (2016). In relevant part, this statutory provision defines "nonsecure detention" as:

> . . . temporary, non-secure custody of the child while the child is released to the custody of the parent, guardian, or custodian in a physically nonrestrictive environment under the supervision of the department staff pending adjudication, disposition or placement. Forms of nonsecure detention include, but are not limited to, home detention, electronic monitoring. . . . Nonsecure detention may include other requirements imposed by the court."

8

§ 985.03(18)(b), Fla. Stat. (2016).

When the trial court conducted this June 20, 2016 hearing, U.T. was "pending a court adjudication" on the new felony charge. On August 1, 2016, when the trial court extended U.T.'s home detention due to repeated violations of the June 20 home detention order (including U.T.'s cutting off his electronic ankle monitor), U.T. was still "pending a court adjudication" in that felony case. In fact, case J16-1474 did not resolve until October 25, 2016, when the State dropped the charge; and U.T. was "pending a court adjudication" in two additional cases (J16-2574 and J16-2946) until those cases were disposed on February 22, 2017, when the trial court found U.T. delinquent in both cases.

Section 985.03(18) does not exclude the placement of a committed child such as U.T. from detention care, and U.T. has provided us with no authority for the proposition that the nonsecure detention expressly authorized by section 985.03(18)(b) is unavailable for juveniles who, like U.T., are also "committed" to DJJ. We read the plain and unambiguous language of section 985.03(18)(b) to authorize a trial court to order home detention to a committed child who has incurred a new criminal charge for which adjudication is pending. See DMB Inv. Tr. v. Islamorada, Vill. of Islands, 225 So. 3d 312, 317 (Fla. 3d DCA 2017) (giving fresh expression to the well-established rule that, where a statute is plain and unambiguous, there is no occasion to resort to statutory interpretation).[6]

**III. Conclusion**

U.T.'s repeated violations of trial court home detention orders were the source of the two judgments holding U.T. in indirect contempt of court. Chapter 985 grants the trial court contempt powers over a juvenile for violation of court orders. § 985.037, Fla. Stat. (2016). Because we conclude that the trial court's home detention orders – requiring U.T. to serve home detention with an electronic ankle monitor – were authorized by Section 985.03(18)(b), we affirm the findings of contempt and sentencing that resulted from U.T.'s violation of such orders.

Affirmed.

---

[6] In 2018, the Florida Legislature amended section 985.03(18) to change "nonsecure detention" to "supervised release," eliminating home detention as a type of custody for a child subject to supervised release. Ch. 2018-86, § 2, Laws of Fla. Because the effective date of this amendment is July 1, 2019, this change has no effect on our adjudication.